Catherine E. Ybarra (SBN # 283360)
cybarra@sirillp.com
Tyler J. Bean*
tbean@sirillp.com
Sonjay C. Singh*
ssingh@sirillp.com
**SIRI & GLIMSTAD LLP**
700 S. Flower Street, Ste. 1000
Los Angeles, CA 90017
Telephone: (213) 376-3739

(*_pro hac vice admission anticipated_)

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
### CIVIL DIVISION

| | |
|---|---|
| **CATHERINE JANIK,** on behalf of herself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>**NEXHEALTH, INC.,** and **GRAND DENTAL ASSOCIATES, P.C.,**<br><br>Defendants. | Case No.<br><br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Catherine Janik ("Plaintiff"), individually and on behalf of all similarly situated persons, alleges the following against Defendant NexHealth, Inc. ("NexHealth"), and Defendants Grand Dental Associates, P.C. ("Grand Dental" and, together with NexHealth, "Defendants"), based upon personal knowledge with respect to herself and on information and belief derived from, among other things, investigation by her counsel and review of public documents as to all other matters:

1

## I.    __INTRODUCTION__

2    1.    Information concerning an individual's health is among the most sensitive, and

3  closely guarded information in our society.

4    2.    The unwanted disclosure of such information can be enormously harmful. It can

5  result in discrimination in the workplace, and denial of insurance coverage. And, if people are

6  unable to trust that their sensitive health information will be kept confidential, they are much less

7  likely to seek medical care when they need it most.

8    3.    Unfortunately, unbeknownst to Plaintiff and other visitors to the NexHealth's

9  client's websites, their private personal and health information was not actually being kept private.

10  Instead, through NexHealth's patient scheduling software, Defendants collected and transmitted

11  personally identifiable, sensitive health information pertaining to Plaintiff and other patients'

12  upcoming appointments, including the fact that the patient made a medical appointment, the name

13  of the clinic with which the patient has scheduled their appointment, the reason for the patient's

14  appointment (*e.g.* a routine dental cleaning, a root canal, an eye exam, a gynecological

15  consultation), and the fact that the patient has or does not have medical insurance (collectively,

16  "Sensitive Health Information") to unauthorized third parties, including Alphabet, Inc. ("Google"),

17  through the use of surreptitious online tracking tools.

18    4.    Online advertising giants, like Google, compile as much information as possible

19  about American consumers, including information relating to the most private aspects of their

20  lives. This information is then used to fuel for a massive, targeted advertising enterprise.

21    5.    Thus, any information about a person captured by these online behemoths can be

22  used to stream ads to that person, among other uses. If Google receives information that a person

23  is concerned about a potential medical issue, it will collect that information and allow its clients to

24  use that information to stream ads related to medical care products and services to that person's

25  computers and smartphones.

26

27

28

CLASS ACTION COMPLAINT

6.     Google offers its clients' website operators access to its proprietary suites of marketing, advertising, and customer analytics software, including Google Analytics, Google AdSense and Google Tag Manager (collectively, the "Business Tools"). Armed with these Business Tools, website operators can leverage Google's enormous database of consumer information for the purposes of deploying targeted advertisements, performing minute analyses of their customer bases, and identifying new market segments that may be exploited.

7.     But, in exchange for access to these Business Tools, website operators install Google's surveillance software on their website (the "Tracking Tools"), including 'tracking pixels' ("Pixels") and third-party 'cookies' that capture sensitive, personally identifiable information provided to the website operator by its website users. This sensitive information can include a unique identifier that Google uses to identify that user, regardless of what computer or phone is used to access the website.  The Tracking Tools can also capture and share other information like the specific webpages visited by a website user, items added to an online shopping cart by a website user, information entered into an online form by a website user, and the device characteristics of a website user's phone or computer.

8.     In essence, when website operators use Google's Business Tools, they choose to participate in Google's mass surveillance network and, in turn, benefit from Google's collection of user data at the expense of their website user's privacy.

9.     Defendants are some of the companies that have chosen to prioritize their marketing efforts and profits over their patients' privacy by installing Google's Tracking Tools on their websites.

10.     Grand Dental is a dental group operating nine dental offices in the State of Illinois.[1]

---

[1] *Home*, GRAND DENTAL, https://www.granddentalgroup.com/ (last accessed Mar. 25, 2025).

CLASS ACTION COMPLAINT

11.    NexHealth is a software company providing practice management software to medical practitioners across the United States, including Grand Dental. In 2022, NexHealth was valued at over $1-billion, and had 68-million patient records under its management.[2]

12.    As part of its software suite, NexHealth offers patient scheduling software that advertises as being able to "[a]utomate appointment booking, reduce no-shows, and fill last-minute cancellations without adding staff or compromising your workflow."[3]

13.    NexHealth's clients, including Grand Dental, install the scheduling software directly onto their practice websites. Through the NexHealth scheduling portal (the "Portal"), patients can schedule, modify, or cancel appointments with their medical practitioner. But, wherever it is installed, the Portal collects and transmits the Sensitive Health Information provided by patients when scheduling their appointments to third parties, including Google, instantaneously and contemporaneously through the Tracking Tools.

14.    Plaintiff and each of the Class Members used the Portal and had their personal Sensitive Health Information tracked by Defendants using the Tracking Tools. However, Defendants **never** obtained authorization from Plaintiff or Class Members to share their Sensitive Health Information with third parties. At all times relevant to this action, Plaintiff and Class Members gave no informed consent for information about their Sensitive Health Information to be transmitted to the third parties, including the largest advertiser and compiler of user information.

15.    Health information is highly regulated by both state and federal law, including the Health Insurance Portability and Accountability Act ("HIPAA"), which imposes criminal penalties on disclosing individually identifiable health information to a third party, including any information that "is created or received by a health care provider" and "relates to the past, present, or future physical or mental health or condition of an individual, the provision of health care to an

---

[2] Torrence, Rebecca, *NexHealth hits unicorn status with $125M series C for patient experience platform*, FIERCE HEALTHCARE (Apr. 22, 2022), https://www.fiercehealthcare.com/health-tech/nexhealth-hits-unicorn-status-125m-series-c-patient-experience-platform (last accessed Mar. 25, 2025).

[3] *Scheduling*, NEXHEALTH, https://www.nexhealth.com/features/nexhealth-scheduling (last accessed Mar. 25, 2025).

CLASS ACTION COMPLAINT

individual, or the past, present, or future payment for the provision of health care to an individual[.]"[4] Accordingly, Defendants' disclosure of Plaintiff's and Class Members' Sensitive Health Information constitutes a violation of HIPAA.

16.    As a result of Defendants' conduct, Plaintiff and Class Members have suffered numerous injuries, including: (i) invasion of medical privacy; (ii) lack of trust in communicating with medical providers; (iii) emotional distress and heightened concerns related to the release of Sensitive Health Information to third parties, (iv) loss of benefit of the bargain; (v) diminution of value of the Sensitive Health Information; (vi) statutory damages and (vii) continued and ongoing risk to their Sensitive Health Information.

17.    Therefore, Plaintiff seeks, on behalf of herself and a class of similarly situated persons, to remedy these harms and asserts the following statutory and common law claims against Defendants: Invasion of Privacy – Intrusion Upon Seclusion; Breach of Confidence; Breach of Fiduciary Duty; Negligence; Breach of Implied Contract; Unjust Enrichment; violations of the Electronic Communications Privacy Act ("ECPA"), 18 U.S.C. § 2511(1), *et seq.*; and violations of the California Invasion of Privacy Act ("CIPA"), Cal. Pen. Code § 360, *et seq.*

## II.    PARTIES

***Plaintiff Catherine Janik***

18.    Plaintiff Catherine Janik is a citizen of the State of Illinois residing in Will County, and brings this action both in an individual capacity, and on behalf of all others similarly situated.

19.    In or around October of 2023, Plaintiff Catherine Janik utilized the Portal on her personal electronic devices to schedule an appointment with Defendant Grand Dental for emergency dental care, in the same manner depicted in Sec. IV(d), *infra*.

20.    Unbeknownst to Plaintiff Catherine Janik, the Portal transmitted the Sensitive Health Information that she input into her appointment form, including the fact that she had scheduled a medical appointment, the name of the clinic that she scheduled her appointment with,

---

[4] 18 U.S.C. § 1320d-(6).

CLASS ACTION COMPLAINT

the medical reason for her appointment, and the fact that she did have insurance to unauthorized third parties, including Google.

21.    Plaintiff Catherine Janik never authorized Grand Dental or NexHealth to disclose any aspect of her communications with Defendants through the Portal to third parties, including the Sensitive Health Information that she provided through the Portal.

22.    On every occasion that she visited the Portal, Plaintiff Catherine Janik possessed an account with Google, and she accessed the Portal while logged into her Google account on the same device.

23.    After providing her Sensitive Health Information to Defendants through the Portal, Plaintiff Janik immediately began seeing targeted online advertisements for dental services and products.

***Defendant NexHealth***

24.    Defendant NexHealth, Inc. is a for-profit corporation incorporated in the State of Delaware with its principal place of business at 445 Bush Street, Fourth Floor, San Francisco, CA, in San Francisco County.

***Defendant Grand Dental***

25.    Defendant Grand Dental Associates, P.C. is domestic business corporation incorporated in the State of Illinois, with its principal place of business at 1780 N. Farnsworth Avenue, Aurora, IL, in Kane County.

### III.    <u>JURISDICTION AND VENUE</u>

26.    This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d). The amount in controversy exceeds the sum of $5,000,000 exclusive of interest and costs, there are more than 100 putative class members and minimal diversity exists because Plaintiff and many putative class members are citizens of a different state than Defendants. Additionally, this Court also has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this Complaint asserts a claim for violation of federal

law, specifically, the ECPA, 18 U.S.C. § 2511. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because all claims alleged herein form part of the same case or controversy.

27.     This Court has general personal jurisdiction over Defendant NexHealth because it is incorporated in and maintains its principal place of business in this District. Further, Defendant NexHealth is authorized to and regularly conduct business in this District and make decisions regarding corporate governance and management of the Portal in this District, including decisions regarding the privacy of patients' Sensitive Health Information and the incorporation of the Tracking Tools.

28.     Venue is proper in this District under 28 U.S.C. § 1391(a)- (d) because: a substantial part of the events giving rise to this action occurred in this District, including decisions made by Defendants' governance and management personnel or inaction by those individuals that led to the unauthorized sharing of Plaintiff's and Class Members' Sensitive Health Information; Defendant NexHealth's principal place of business is located in this District; Defendants' collect and redistribute Class Members' Sensitive Health Information in this District; and Defendants caused harm to Class Members residing in this District.

\
\
\
\

CLASS ACTION COMPLAINT

## IV.    FACTUAL ALLEGATIONS

### A.    DEFENDANTS' USE OF THIRD-PARTY TRACKING TECHNOLOGIES

#### i.    Google's Mass Advertising Surveillance Operation

29.    Google is the largest digital advertiser in the country, accounting for 26.8-percent of the total digital advertising revenue generated in the United States.[5] In 2023, Google's advertising revenue of $238 billion accounted for 77-percent of its total revenue for the year.[6]

30.    Google advertises Google Analytics and other Business Tools to website operators, like Defendant, claiming they will allow the operator to "[u]nderstand [their] site and app users," "check the performance of [their] marketing," and "[g]et insights only Google can give."[7] But, in order for website operators to get information from Google Analytics about their website's visitors, they must allow data collection through installation of Google's Tracking Tools on their website.[8]

31.    Indeed, on its *Privacy & Terms* page, Google admits that it collects information from third party websites, stating that "[m]any websites and apps use Google services to improve their content and keep it free. When they integrate our services, these sites and apps share information with Google."[9]

---

[5] *Share of major ad-selling companies in digital advertising revenue in the United States*, STATISTA (May 2024), https://www.statista.com/statistics/242549/digital-ad-market-share-of-major-ad-selling-companies-in-the-us-by-revenue/#:~:text=In%202023%2C%20Google%20accounted%20for,21.1%20and%2012.5%20percent%2C%20respectively  https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last accessed Mar. 25, 2025).

[6] Florian Zandt, *Google's Ad Revenue Dwarfs Competitors*, STATISTA (Sep. 10, 2024), https://www.statista.com/chart/33017/annual-advertising-revenue-of-selected-tech-companies-offering-search-solutions/#:~:text=Online%20advertising&text=Alphabet%2C%20the%20company%20behind%20the,overall%20revenue%20this%20past%20year (last accessed Mar. 25, 2025).

[7] *Welcome to Google Analytics*, GOOGLE, https://analytics.google.com/analytics/web/provision/?authuser=0#/provision (last accessed Mar. 25, 2025).

[8] *See* Aaron Ankin & Surya Matta, *The High Privacy Cost of a "Free" Website*, THE MARKUP, https://themarkup.org/blacklight/2020/09/22/blacklight-tracking-advertisers-digital-privacy-sensitive-websites (last accessed Mar. 25, 2025).

[9] *Privacy & Terms – How Google uses information from sites or apps that use our services*, GOOGLE, https://policies.google.com/technologies/partner-sites (last accessed Mar. 25, 2025).

32.     Google also admits that it uses the information collected from third party websites, such as the Portal, to sell targeted advertising, explaining to users that, "[f]or example, a website that sells mountain bikes might use Google's ad services. After you visit that site, you could see an ad for mountain bikes on a different site that shows ads served by Google."[10]

33.     While Google admits that it collects information from third-party websites through the Tracking Tools, it does not provide, nor could it provide, a publicly available list of every webpage on which its Tracking Tools are installed. As such, the vague descriptions of Google's data collection practices referenced above could not give Plaintiff and Class Members any reason to think that Defendants were part of Google's surveillance network. Moreover, as Defendants do not disclose their use of Google's Tracking Tools, Plaintiff and Class Members could not have been reasonably expected to review any of Google's privacy statements in connection with their use of the Portal.

34.     Google aggregates the user information that it collects from third-party websites into 'advertising profiles' consisting of all of the data that it has collected about a given user.[11] With these advertising profiles, Google can sell hyper-precise advertising services, allowing its clients to target internet users based on combinations of their location, age, race, interests, hobbies, life events (e.g., recent marriages, graduation, or relocation), political affiliation, education level, home ownership status, marital status, household income, type of employment, use of specific apps or websites, and more.[12]

35.     Google's surveillance of individual's internet usage is ubiquitous. In 2017, Scientific American reported that over 70-percent of smartphone apps report "personal data to

---

[10] *Id.*

[11] Bennett Cyphers & Gennie Gebhart, *Behind the One-Way Mirror: A Deep Dive Into the Technology of Corporate Surveillance*, ELECTRONIC FRONTIER FOUNDATION (2019), *available online at*: https://www.eff.org/files/2019/12/11/behind_the_one-way_mirror a_deep_dive_into_the_technology_of_corporate_surveillance_0.pdf.

[12] *About audience segments*, GOOGLE ADS, https://support.google.com/google-ads/answer/2497941?hl=en#zippy=%2Cin-market-segments%2Caffinity-segments%2Clife-events%2Cdetailed-demographics (last accessed Mar. 25, 2025).

third-party tracking companies like Google,"[13] and Google trackers are present on 74-percent of all web traffic.

36. Moreover, as in this case, the data collected by Google often pertains to the most personal and sensitive aspects of an individual's life. For example:

a. 93-percent of pornography websites allow third parties, including Google, to collect their user's browsing habits.[14] In fact, Google advertising trackers were found on 73-percent of pornography websites.[15]

b. 81-percent of the most popular mobile apps for managing depression and quitting smoking allowed Facebook and/or Google to access subscriber information, including health diary entries and self-reports about substance abuse.[16]

c. Twelve of the largest pharmacy providers in the United States send information regarding user's purchases of products such as pregnancy tests, HIV tests, prenatal vitamins, and Plan B to online advertisers.[17] For example, when an online shopper searches for a pregnancy test, views the product page for a pregnancy test, or adds a pregnancy test to their online shopping cart on Kroger's website, that information is transmitted to Google.[18]

---

[13] Narseo Vallina-Rodriguez & Srikanth Sundaresan, *7 in 10 Smartphone Apps Share Your Data with Third-Party Services*, SCIENTIFIC AMERICAN (May 30, 2017), https://www.scientificamerican.com/article/7-in-10-smartphone-apps-share-your-data-with-third-party-services/ (last accessed Mar. 25, 2025).

[14] Elena Maris, Timothy Libert & Jennifer R. Henrichsen, *Tracking sex: The implications of widespread sexual data leakage and tracking on porn websites*, NEW MEDIA & SOCIETY (2020), *available online at*: https://journals.sagepub.com/doi/10.1177/1461444820924632.

[15] *Id*.

[16] Kit Huckvale, John Torous & Mark E. Larsen, *Assessment of the Data Sharing and Privacy Practices of Smartphone Apps for Depression and Smoking Cessation*, JAMA NETWORK OPEN (2019), *available online at*: https://pubmed.ncbi.nlm.nih.gov/31002321/.

[17] Darius Tahir & Simon Fondrie-Teitler, *Need to Get Plan B or an HIV Test Online? Facebook May Know About It*, THE MARKUP (June 30, 2023), https://themarkup.org/pixel-hunt/2023/06/30/need-to-get-plan-b-or-an-hiv-test-online-facebook-may-know-about-it (last accessed Mar. 25, 2025).

[18] Jon Keegan, *Forget Milk and Eggs: Supermarkets Are Having a Fire Sale on Data About You*, THE MARKUP (Feb. 16, 2023), https://themarkup.org/privacy/2023/02/16/forget-milk-and-eggs-supermarkets-are-having-a-fire-sale-on-data-about-you (last accessed Mar. 25, 2025).

CLASS ACTION COMPLAINT

37.     This monumental, invasive surveillance of Americans' internet usage and resulting violation of their privacy is not accidental. As Google's then-CEO, Eric Schmit, admitted in 2010: "We know where you are. We know where you've been. We can more or less know what you're thinking about."[19]

38.     In fact, Google values user information so highly that it provides its Business Tools to many website operators for free, all to expand its surveillance apparatus.[20]

39.     When website operators, like Defendants, make use of Google's Business Tools, they are essentially choosing to participate in Google's mass surveillance network and, in return, they benefit from Google's collection of user data at the expense of their website users' privacy. For example, Google rewards website operators for providing it with user information by granting such website operators access to its Analytics platform, which then leverages demographic data collected by Google to provide detailed analyses of the website's user base.[21]

40.     Unfortunately, it is usually the case that a website operator's use of third-party tracking software is not disclosed whatsoever in its privacy policy.[22] And even where the use of such third-party software is disclosed, such disclosures are often hidden and cloaked in such confusing, technical and overly legal language as to be indecipherable to the typical internet user.[23]

41.     Moreover, for even a conscientious internet user, the massive volume of privacy policies encountered through routine internet use makes reviewing each and every one practically

---

[19] Andrew Orlowski, *Google's Schmidt: We know what you're thinking*, THE REGISTER (Oct. 4, 2020), https://www.theregister.com/2010/10/04/google_ericisms/ (last accessed Mar. 25, 2025).

[20] *Analytics Overview*, GOOGLE, https://marketingplatform.google.com/about/analytics/ (last accessed Mar. 25, 2025) ("Google Analytics gives you the tools, free of charge"),

[21]     *Google    Marketing    Platform    –    Features*,    GOOGLE, https://marketingplatform.google.com/about/analytics/features/ (last accessed Mar. 25, 2025).

[22] *See* Woodrow Hartzog, *Privacy's Blueprint*, 60-67 (Harvard University Press 2018) (detailing deficiencies with online privacy policies).

[23] *Id*.

impossible. According to one study, it would take the average internet user 244 hours – or 30.5 working days – to read the privacy policy of every new website that they visited in a single year.[24]

### ii. Pixels Can Record Almost Every Interaction Between a User and a Website

42. In order to use Google's Business Tools, Defendants installed Google's Tracking Tools, including tracking Pixels, onto the Portal.

43. Pixels are one of the tools used by website operators to track user behavior. As the Federal Trade Commission ("FTC") explains, a Pixel is:

> [A] small piece of code that will be placed into the website or ad and define [the Pixel operator's] tracking goals such as purchases, clicks, or pageviews…

> Pixel tracking can be monetized several ways. One way to monetize pixel tracking is for companies to use the tracking data collected to improve the company's own marketing campaigns…Another is that companies can monetize the data collected by further optimizing their own ad targeting systems and charging other companies to use its advertising offerings.[25]

44. Pixels can collect a shocking amount of information regarding an individual's online behavior—including the webpages viewed by the user, the amount of time spent by the user on specific webpages, the buttons and hyperlinks that the user clicks while using a website, the items that the user adds to an online shopping cart, the purchases that a user makes through an online retailer, the text entered by the user into a website search bar, and even the information

---

[24] Aleecia M. McDonald & Lorrie Faith Cantor, *The Cost of Reading Privacy Policies*, I/S: A JOURNAL OF LAW AND POLICY FOR THE INFORMATION SOCIETY (2008), *available online at*: https://lorrie.cranor.org/pubs/readingPolicyCost-authorDraft.pdf.

[25] *Lurking Beneath the Surface: Hidden Impacts of Pixel Tracking*, FEDERAL TRADE COMMISSION – OFFICE OF TECHNOLOGY (Mar. 6, 2023), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2023/03/lurking-beneath-surface-hidden-impacts-pixel-tracking (last accessed Mar. 25, 2025).

CLASS ACTION COMPLAINT

provided by the user on an online form—all transmitted in real-time as the user navigates a website.[26]

45.      But most internet users are completely unaware that substantial information about their internet usage is being collected through tracking Pixels. The FTC warns that:

> Traditional controls such as blocking third party cookies may not entirely prevent pixels from collecting and sharing information. Additionally, many consumers may not realize that tracking pixels exist because they're invisibly embedded within web pages that users might interact with…Academic and public reporting teams have found that thousands of the most visited webpages have pixels and other methods that leak personal information to third parties.[27]

### iii.      The Pixels Installed on the Portal Transmit Personally Identifiable Information and Protected Health Information to Google

46.      Every website is hosted by a computer "server" that holds the website's contents.

47.      To access a website, individuals use "web browsers." Web browsers are software applications that allow consumers to navigate the web and view and exchange electronic information and communications over the Internet.  Each "client device" (such as computer, tablet, or smartphone) accesses web content through a web browser (such as Google's Chrome, Mozilla's Firefox, Apple's Safari, or Microsoft's Edge).

48.      Communications between a website server and web browser consist of Requests and Responses. Any given browsing session may consist of hundreds or even thousands of individual Requests and Responses. A web browser's Request essentially asks the website to provide certain information, such as the contents of a given webpage when the user clicks a link, and the Response from the website sends back the requested information – the web pages' images,

---

[26] *See id.*; *How does retargeting on Facebook help your business?*, META, https://www.facebook.com/business/goals/retargeting (last accessed Mar. 25, 2025); Tom Kemp, *"Oops! I Did It Again" … Meta Pixel Still Hoovering Up Our Sensitive Data*, MEDIUM, https://tomkemp00.medium.com/oops-i-did-it-again-meta-pixel-still-hoovering-up-our-sensitive-data-f99c7b779d47#_ftn1 (last accessed Mar. 25, 2025).

[27] *Lurking Beneath the Surface, supra* note 25.

CLASS ACTION COMPLAINT

words, buttons, and other features that the browser shows on the user's screen as they navigate the website.

49.     Additionally, on most websites, the Response sent back to the user's web browser directs the browser to create small files known as 'cookies' on the user's device.[28] These cookies are saved by the user's web browser, and are used to identify the website user as they browse the website or on subsequent visits to the site.[29] For example, in a more innocuous use case, a cookie may allow the website to remember a user's name and password, language settings, or shopping cart contents.[30]

50.     When a Google user logs onto their account, their web browser records a Google tracking cookie.[31] This cookie includes a specific line of code that links the web browser to the user's Google account.[32]

51.     Google's Pixels use cookies but operate differently than a cookie.  Rather than directing the browser to save a file on the user's device, the Pixels acquire information from the browser without notifying the user.  The information can include details about the user, his or her interactions with the website, and information about the user's environment (*e.g.,* type of device, type of browser, and sometimes even the physical location of the device), all relayed contemporaneously as the website user navigates the website.

52.     Simultaneously, the Google Pixels, like those installed on the Portal, request identifying information from any Google cookies previously installed on the user's web browser.

53.     The Pixels then combine the data received from the browser with the data acquired from the cookie, and instructs the web browser to transmit the information back to Google. As a result, Google can link all of the user information collected by their Pixels to the user's identity,

---

[28] *What is a web browser?*, MOZILLA, https://www.mozilla.org/en-US/firefox/browsers/what-is-a-browser/ (last accessed Mar. 25, 2025).

[29] *Id.*

[30] *Id.*

[31] Cyphers, *supra* note 11.

[32] *Id.*

via the user's Google profile. Thus, even if a user never actually logs into a website or fills out a form, the website, along with Google, can know the user's identity.

54.    A remarkable number of Americans possess a Google account. Just one of Google's many products, its Gmail e-mail client, is used by over one-third of Americans.[33] When these users visit a website, like those on which the Portal has been installed, that utilizes a Google Pixel, any information collected by the Pixel can be linked to the user's identity through the Google cookies installed on the user's web browser.

55.    However, it is not only Google account holders that are at risk of having Pixel-collected website data linked to their identities. Rather, Google utilizes sophisticated data tracking methods to identify even those few users who do not have a Google account.

56.    Google's Pixels, like those on the Portal, can acquire information about the user's device and browser, such as their screen resolution, time zone setting, browser software type and version, operating system type and version, language setting, and IP address.

57.    An internet user's combination of such device and browser characteristics, commonly referred to as their "browser fingerprint," is "often unique."[34] By tracking this browser fingerprint, Google is able to compile a user's activity across the internet.[35] And, as Google continuously compiles user data over time, its understanding of the user's browser fingerprint becomes more sophisticated such that it needs only to collect a single piece of identifying information to identify the user linked to a browser fingerprint.

---

[33] *See* Harsha Kiran, *49 Gmail Statistics To Show How Big It Is In 2024*, TECHJURY (Jan. 3, 2024), https://techjury.net/blog/gmail-statistics/ (last accessed Mar. 25, 2025) ("Gmail accounts for 130.9 million of the total email users in the US"). The United States population is approximately 337.4 million. *See* UNITED STATES CENSUS BUREAU, https://www.census.gov/popclock/ (last accessed Mar. 25, 2025).

[34] Cyphers, *supra* note 11.

[35] *Id.*

iv.     **Defendants Disclosed Plaintiff's and Class Members' Sensitive Health Information to Google.**

58.     To schedule or re-schedule an appointment with their medical providers, Plaintiff and Class Members were required to complete a scheduling form through the Portal hosted on their medical provider's website.

59.     Unbeknownst to Plaintiff and Class Members, Defendants intentionally configured the Tracking Tools installed on the Portal to capture and transmit the Sensitive Health Information that they communicated to Defendants while scheduling their appointments to third parties, including Google.

60.     The following screenshots ("Figures 1 & 2") depict the network transmissions made by the Google Tracking Tools installed on the Portal.[36] As Figures 1 & 2 show, when patients schedule an appointment in the Portal, the Sensitive Health Information requested and contemporaneously transmitted to Google by the Tracking Tools installed on the Portal include the fact that the patient made a medical appointment, the name of the clinic with which the patient has scheduled their appointment (in this example, Bethesda Dental Associates), the reason for the patient's appointment (in this example, an emergency appointment due to tooth pain), and the fact that the patient has or does not have medical insurance.

61.     Further, the information that was transmitted to Google was accompanied by specific lines of code linking the Sensitive Health Information provided by Plaintiff to their identities. The following screenshots show that the Google Pixel on the Portal transmitted the identifier numbers attached to Google's 'cid,' and 'sid' cookies, which identify the user's Google account, along with other information that is commonly used to create a browser fingerprint, such as the user's language selection, screen resolution, IP address, web browser software and version number, and operating system and version number.

---

[36] Figures 1 & 2 were captured from the Portal installed on a NexCare client's website. Wherever it is installed, the Portal includes Google Tracking Tools which transmit the same categories of information, in the same manner as depicted in Figures 1 & 2.

```
tid: G-CB46XQ5F8H
gtm: 45je53a1v9103230936z8849745072za200zb849745072
_p: 1741806142857
gcd: 13l3l3l3l1l11
npa: 0
dma: 0
tag_exp: 102482433~102587591~102640600~102717422~102788824~102791784~102814059~102825837
cid: 1425757705.1741806143
ul: en-us
sr: 1920x1080
uaa: x86
uab: 64
uafvl: Chromium;134.0.6998.88|Not%3AA-Brand;24.0.0.0|Google%20Chrome;134.0.6998.88
uamb: 0
uam:
uap: Windows
uapv: 19.0.0
uaw: 0
are: 1
frm: 0
pscdl: noapi
_s: 11
sid: 1741806143
sct: 1
seg: 1
dl: https://app.nexhealth.com/appts/underbitedental/patient-details?lid=23549
dr: https://app.nexhealth.com/appts/underbitedental/scheduling-for?lid=23549
dt: Create an appointment | NexHealth
en: Online Booking Completed
_c: 1
epn.institutionId: 3278
ep.appointment_type: Emergency / Tooth Pain
ep.patient_type: new
ep.has_insurance: true
ep.booking_for: myself
ep.lid: 23549
_et: 14884
tfd: 94458
```

CLASS ACTION COMPLAINT

```
v: 2
tid: G-CB46XQ5F8H
gtm: 45je53a1v9103230936z8849745072za200zb849745072
_p: 1741806142857
gcd: 13l3l3l3l1l1
npa: 0
dma: 0
tag_exp: 102482433~102587591~102640600~102717422~102788824~102791784~102814059~102825837
cid: 1425757705.1741806143
ul: en-us
sr: 1920x1080
uaa: x86
uab: 64
uafvl: Chromium;134.0.6998.88|Not%3AA-Brand;24.0.0.0|Google%20Chrome;134.0.6998.88
uamb: 0
uam:
uap: Windows
uapv: 19.0.0
uaw: 0
are: 1
frm: 0
pscdl: noapi
_s: 4
sid: 1741806143
sct: 1
seg: 0
dl: https://app.nexhealth.com/appt/underbitedental?lid=23549
dr: https://bethesdadentalassociates.com/
dt: Create an appointment | NexHealth
en: Appointment Type Selected
epn.institutionId: 3278
ep.appointment_type: Emergency / Tooth Pain
ep.patient_type: null
ep.has_insurance: null
ep.booking_for: null
_et: 1910
tfd: 19496
```

*Figures 1 & 2. Screenshots depicting back-end network traffic from the Portal which shows information transmitted to Google when Portal users schedule an appointment.*

62.    In their default state, Google's Pixels record and transmit only "automatic events," consisting largely of routine user behavior, such as clicking a link, clicking on an advertisement,

CLASS ACTION COMPLAINT

or viewing a webpage.[37] Defendants purposely configured the Google Pixels on the Portal to collect and transmit additional user data, including the information entered by patients on their appointment scheduling forms.

63.    By installing third-party Tracking Tools, including tracking Pixels, on the Portal, and by further configuring those Pixels to collect their patients' Sensitive Health Information, Defendants knowingly and intentionally caused Plaintiff's and Class Members' Sensitive Health Information to be transmitted to third parties, including Google.

### B.    DEFENDANTS' USE OF THE TRACKING TOOLS VIOLATES HIPAA.

64.    The disclosure of Plaintiff's and Class Members' Private Information via the Tracking Tools contravenes the letter and spirit of HIPAA's "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") which governs how health care providers must safeguard and protect Private Information.[38]

65.    The HIPAA Privacy Rule sets forth policies to protect all Individually Identifiable Health Information ("IIHI") that is held or transmitted by a covered entity such as Defendants. These are the 18 HIPAA Identifiers that are considered personally identifiable information because this information can be used to identify, contact, or locate a specific person or can be used with other sources (such as a person's Google account) to identify a single individual. When IIHI is used in conjunction with one's physical or mental health or condition, health care, and/or one's payment for that health care, it becomes Personal Health Information ("PHI").[39]

---

[37]    *Automatically    Collected    Events*, GOOGLE    ANALYTICS    HELP, https://support.google.com/analytics/answer/9234069, (last visited on Mar. 25, 2025).

[38] *See* 45 C.F.R. Part 160, 164; *see also The HIPAA Privacy Rule*, U.S. DEPT OF HEALTH AND HUMAN SERVICES (Sep. 27, 2024), https://www.hhs.gov/hipaa/for-professionals/privacy/index.html (last accessed Mar. 25, 2025).

[39]    *Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, U.S. DEPT. OF HEALTH AND HUMAN SERVICES (Feb. 3, 2025), https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html, (last accessed Mar. 25, 2025) (stating that HIPAA Identifiers include names; all geographic subdivisions smaller than a state, including street address, city, county, precinct, ZIP code, and their equivalent geocodes; all elements of dates (except year) for dates that are directly related to an individual, including birth date, admission date, discharge date and age; telephone numbers; email

66.     While healthcare entities regulated under HIPAA may use third-party tracking tools, such as the Tracking Tools, they can do so only in a very limited way, to perform analysis on data key to operations.

67.     Simply put, the HIPAA Privacy Rule forbids covered entities, such as Defendants from using internet surveillance software such as the Tracking Tools in a way that exposes a patient's Sensitive Health Information to any third party without the patient's express and informed consent.

68.     The Office for Civil Rights ("OCR") at the United States Department of Health and Human Services ("HHS") has clearly stated that the unlawful transmission of Sensitive Health Information violates HIPAA's Privacy Rule:

> Regulated entities [those to which HIPAA applies] are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules. ***For example, disclosures of PHI to tracking technology vendors for marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.***[40]

69.     Under HIPAA, a healthcare provider may not disclose personally identifiable, non-public medical information about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[41]

70.     Guidance from the United States Department of Health and Human Services instructs healthcare providers that patient status alone is protected by HIPAA.

71.     The Privacy Rule broadly defines PHI as IIHI that is "transmitted by electronic media; maintained in electronic media; or transmitted or maintained in any other form or medium."

---

addresses; medical record numbers; health plan beneficiary numbers; account numbers; device identifiers and serial numbers; web URL; internet protocol (IP) address; and any other characteristic that could uniquely identify the individual).

[40] *Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates,* U.S. DEPT OF HEALTH AND HUMAN SERVICES (June 26, 2024), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last accessed Mar. 26, 2025).

[41] 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502, 164.508(a)(3), 164.514(b)(2)(i).

CLASS ACTION COMPLAINT

1   45 C.F.R. § 160.103.

2   72.    IIHI is defined as "a subset of health information, including demographic

3   information collected from an individual" that is: (1) "created or received by a health care provider,

4   health plan, employer, or health care clearinghouse"; (2) "[r]elates to the past, present, or future

5   physical or mental health or condition of an individual; the provision of health care to an

6   individual; or the past, present, or future payment for the provision of health care to an individual";

7   and (3) either (a) "identifies the individual" or (b) "[w]ith respect to which there is a reasonable

8   basis to believe the information can be used to identify the individual."[42]

9   73.    Under the HIPAA de-identification rule, health information is not considered

10  individually identifiable under only two circumstances: if, (1) an expert has "determine[d] that the

11  risk is very small that the information could be used, alone or in combination with other reasonably

12  available information, by an anticipated recipient to identify an individual who is a subject of the

13  information" and "document[ed] the methods and results of the analysis that justify such

14  determination.'"[43] Or, (2), if all enumerated identifiers of the individual or their family members

15  are removed, including names, medical record numbers, account numbers, device identifiers,

16  device serial numbers, URLs, IP addresses, and "[a]ny other unique identifying number,

17  characteristic, or code," so that the entity does not "have actual knowledge that the information

18  could be used alone or in combination with other information to identify an individual who is a

19  subject of the information."[44]

20  74.    The HIPAA Privacy Rule requires any "covered entity" to maintain appropriate

21  safeguards to protect the privacy of protected health information, and sets limits and conditions on

22  the uses and disclosures that may be made of protected health information without authorization.[45]

23  75.    Even the fact that an individual is receiving a medical service, *i.e.*, is a patient of a

24

25  [42] 45 C.F.R. § 160.103.
    [43] 45 C.F.R. § 160.514.

26  [44] *Id.*

27  [45] 45 C.F.R. §§ 160.103, 164.502.

28

CLASS ACTION COMPLAINT

particular entity, can be PHI. HHS has instructed health care providers that, while identifying information alone is not necessarily PHI if it were part of a public source such as a phonebook because it is not related to health data, "[i]f such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI."[46]

76.    Consistent with this restriction, the HHS has issued marketing guidance that provides that:

> With limited exceptions, the [Privacy] Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing . . . Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients or enrollees to third parties without obtaining authorization from each person on the list.[47]

77.    Here, Defendants provided patient information to third parties, including Google, in violation of the Privacy Rule.

78.    HIPAA also requires Defendants to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information[,]"[48] and to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights."[49]

79.    Defendants further failed to comply with other HIPAA safeguard regulations as follows:

---

[46]    *See Guidance Regarding Methods for De-Identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/special-topics/de-identification/index.html (last accessed Mar. 25, 2025).

[47]    *Marketing*, HHS, https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/marketing/index.html (last accessed Mar. 25, 2025).

[48] 45 C.F.R. § 164.306(c).

[49] 45 C.F.R. § 164.312(a)(1).

CLASS ACTION COMPLAINT

a. Failing to ensure the confidentiality and integrity of electronic PHI that Defendants created, received, maintained, and transmitted in violation of 45 C.F.R. § 164.306(a)(1);

b. Failing to implement policies and procedures to prevent, detect, contain, and correct security violations in violation of 45 C.F.R. section 164.308(a)(1);

c. Failing to identify and respond to suspected or known security incidents and mitigate harmful effects of security incidents known to Defendants in violation of 45 C.F.R. § 164.308(a)(6)(ii);

d. Failing to protect against reasonably anticipated threats or hazards to the security or integrity of electronic PHI in violation of 45 C.F.R. § 164.306(a)(2);

e. Failing to protect against reasonably anticipated uses or disclosures of electronic PHI not permitted under the privacy rules pertaining to individually identifiable health information in violation of 45 C.F.R. § 164.306(a)(3);

f. Failing to effectively train their workforces (including independent contractors) on the policies and procedures for PHI as necessary and appropriate to carry out job functions while maintaining security of PHI beyond using imitation phishing email software in violation of 45 C.F.R. §§ 164.530(b) and 164.308(a)(5); and

g. Failing to design, implement, and enforce policies and procedures that would establish physical and administrative safeguards to reasonably safeguard PHI in violation of 45 C.F.R. § 164.530(c).

80. In its *Guidance Regarding Methods for De-Identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule*, HHS instructed that:

Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at

a certain clinic, then this information would be PHI.[50]

81.    HHS has further instructed that:

The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, *covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list*. (Emphasis added).[51]

82.    In fact, HHS has repeatedly instructed for years that patient status is protected by the HIPAA Privacy Rule:

    a.  "The sale of a patient list to a marketing firm" is not permitted under HIPAA. 65 Fed. Reg. 82717 (Dec. 28, 2000);

    b.  "A covered entity must have the individual's prior written authorization to use or disclose protected health information for marketing communications," which includes disclosure of mere patient status through a patient list. 67 Fed. Reg. 53186 (Aug. 14, 2002); and

    c.  It would be a HIPAA violation "if a covered entity impermissibly disclosed a list of patient names, addresses, and hospital identification numbers." 78 Fed. Reg. 5642 (Jan. 25, 2013).

83.    Additionally, OCR has issued a Bulletin to highlight the obligations of HIPAA covered entities and business associates ("regulated entities") under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online tracking technologies.[52]

---

[50] *Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule*, U.S. DEPT. OF HEALTH AND HUMAN SERVICES (Nov. 26, 2012), at p. 5, *available online at*: https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.

[51] *Marketing*, U.S. DEPT. OF HEALTH AND HUMAN SERVICES (Apr. 3, 2003), *available online at*: https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf.

[52] *See Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates*, U.S. DEPT. OF HEALTH AND HUMAN SERVICES (June 26, 2024), https://www.hhs.gov/hipaa/for-professionals/privacy/guidance/hipaa-online-tracking/index.html (last accessed Mar. 25, 2025).

CLASS ACTION COMPLAINT

84. The Bulletin expressly provides that "**[r]egulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules.**"[53]

85. Software vendors, like NexHealth, as well as tracking technology vendors like Google, are considered business associates under HIPAA where, as here, they provide services to covered entities and receive and maintain PHI:

> Furthermore, tracking technology vendors are business associates if they create, receive, maintain, or transmit PHI on behalf of a regulated entity for a covered function (*e.g.* health care operations) or provide certain services to or for a covered entity (or another business associate) that involve the disclosure of PHI. In these circumstances, regulated entities must ensure that the disclosures made to such vendors are permitted by the Privacy Rule and enter into a business associate agreement (BAA) with these tracking technology vendors to ensure that PHI is protected in accordance with the HIPAA Rules. For example, if an individual makes an appointment through the website of a covered health clinic for health services and that website uses third party tracking technologies, then the website might automatically transmit information regarding the appointment and the individual's IP address to a tracking technology vendor. In this case, the tracking technology vendor is a business associate and a BAA is required.[54]

86. The Bulletin further explained that health care providers violate HIPAA when they use tracking technologies that disclose an individual's identifying information even if no treatment information is included and even if the individual does not have a relationship with the health care provider:

> Regulated entities disclose a variety of information to tracking technology vendors through tracking technologies placed on a regulated entity's website or mobile app, including individually identifiable health information (IIHI) that the individual providers when they use regulated entities' websites or mobile apps. This information might include an individual's medical record number, home or email address, or dates of appointments, as well as an individual's IP address or geographic location, medical device IDs, or any unique identifying code. All such IIHI collected on a regulated entity's website or mobile app generally is PHI, even

---

[53] *Id.* (emphasis in original).

[54] *Id.*

if the individual does not have an existing relationship with the regulated entity and even if the IIHI, such as IP address or geographic location, does not include specific treatment or billing information like dates and types of health care services. **This is because, when a regulated entity collects the individual's IIHI through its website or mobile app, the information connects the individual to the regulated entity (i.e. it is indicative that the individual has received or will receive health care services or benefits from the covered entity), and thus relates to the individual's past, present, or future health or health care or payment for care.**[55]

87.    HHS also explained in the Bulletin that tracking technologies on health care providers' patient portals "generally have access to PHI" and may access diagnoses and treatment information, in addition to other sensitive data:

Regulated entities may have user-authenticated webpages, which require a user to log in before they are able to access the webpage, such as a patient or health plan beneficiary portal or a telehealth platform. **Tracking technologies on a regulated entity's user-authenticated webpages generally have access to PHI.** Such PHI may include, for example, an individual's IP address, medical record number, home or email addresses, dates of appointments, or other identifying information that the individual may provide when interacting with the webpage. Tracking technologies within user-authenticated webpages may even have access to an individual's diagnosis and treatment information, prescription information, billing information, or other information within the portal. Therefore, a regulated entity must configure any user-authenticated webpages that include tracking technologies to allow such technologies to only use and disclose PHI in compliance with the HIPAA Privacy Rule and must ensure that the electronic protected health information (ePHI) collected through its website is protected and secured in accordance with the HIPAA Security Rule.[56]

88.    The Bulletin is not a pronouncement of new law. It is simply a reminder to covered entities of their longstanding obligations under HIPAA. Indeed, the Bulletin notes that "it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors," then explains how online tracking technologies violate the same HIPAA rules that have

---

[55] *Id.* (emphasis added).

[56] *Id.* (emphasis added).

existed for decades.[57]

89.    In other words, HHS has expressly stated that Defendants have violated HIPAA Rules by implementing the Tracking Technologies. Courts, including in this District, have found the same under near-identical circumstances.[58]

## C.    DEFENDANTS DISCLOSED PLAINTIFF'S AND CLASS MEMBERS' SENSITIVE INFORMATION TO THIRD PARTIES WITHOUT THEIR KNOWLEDGE OR CONSENT

### i.    Defendants failed to inform Plaintiff and Class Members of their disclosure of Plaintiff's and Class Members' Sensitive Health Information.

90.    Defendants violated HIPAA, as explained in § IV(B), *infra*, as well as Plaintiff's and Class Members' right to privacy, by unlawfully disclosing their Sensitive Health Information to third parties, including Google. Specifically, Plaintiff and Class Members had a reasonable expectation of privacy including that Defendants would not disclose their Sensitive Health Information to third parties. Defendants did not inform Plaintiff that they were sharing her Sensitive Health Information with third parties, including Google.

91.    By engaging in this improper sharing of information without Plaintiff's and Class Members' express consent, Defendants breached Plaintiff's and Class Members' right to privacy and unlawfully disclosed their Sensitive Health Information.

---

[57] *Id.* (citing 78 FR 5566, 5598, a rulemaking notice from January 25, 2013, which stated:

> [P]rotected health information … may not necessarily include diagnosis-specific information, such as information about the treatment of an individual, and may be limited to demographic or other information not indicative of the type of health care services provided to an individual. If the information is tied to a covered entity, then it is protected health information by definition since it is indicative that the individual received health care services or benefits from the covered entity, and therefore it must be protected … in accordance with the HIPAA rules.).

[58] *See St. Aubin v. Carbon Health Techs., Inc.,* No. 24-cv-00667-JST, 2024 U.S. Dist. LEXIS 179067, at *35-37 (N.D. Cal. Oct. 1, 2024); *A.D. v. Aspen Dental Mgmt., Inc*., No. 24 C 1404, 2024 U.S. Dist. LEXIS 161090, at *2-10 (N.D. Ill. Sep. 9, 2024).

CLASS ACTION COMPLAINT

ii.    **The Tracking Tools Used by Defendants Were Imperceptible to Plaintiff and Class Members**

92.    The Tracking Tools installed on the Portal were invisible to Plaintiff and Class Members. Without analyzing the network information transmitted by the Portal through examination of its source code or the use of sophisticated web developer tools, there was no way for a Portal user to discover the presence of the Tracking Tools. As a result, typical internet users, such as Plaintiff and Class Members, were unable to detect the Tracking Tools on the Portal.

93.    Plaintiff and Class Members were shown no disclaimer or warning that their Sensitive Health Information would be disclosed to any unauthorized third party without their express consent.

94.    Plaintiff and Class Members did not know that their Sensitive Health Information was being collected and transmitted to an unauthorized third party.

95.    Because Plaintiff and Class Members were not aware of the Tracking Tools on the Portal, or that their Sensitive Health Information would be collected and transmitted to Google, they could not and did not consent to Defendants' conduct.

D.    **DEFENDANTS WERE ENRICHED BY THEIR DISCLOSURE OF PLAINTIFF'S AND CLASS MEMBERS' SENSITIVE INFORMATION TO THIRD PARTIES**

i.    **Defendants Received Material Benefits in Exchange for Plaintiff's and Class Members' Sensitive Health Information**

96.    As explained, *supra*, users of Google's Business Tools, like Defendants, receive access to advertising and marketing analytics services in exchange for installing Google's Tracking Tools on their website.

97.    Upon information and belief, Defendants, as users of Google's Business Tools, received compensation in the form of advanced advertising services and cost-effective marketing on third-party platforms in exchange for allowing Google to collect Plaintiff's and Class Members' Sensitive Health Information.

ii.      **Plaintiff's and Class Members' Data Had Financial Value**

98.      Moreover, Plaintiff's and Class Members' Sensitive Health Information has value and Defendants' disclosure and interception of that Sensitive Health Information harmed Plaintiff and the Class.

99.      According to the annual reports of Facebook, another major online advertising proprietor, the value it derives from user data has continuously risen. "In 2013, the average American's data was worth about $19 per year in advertising sales to Facebook, according to its financial statements. In 2020, [it] was worth $164 per year."[59]

100.      Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 are as high as $434 per user, for a total of more than $200 billion industry wide.

101.      Moreover, health information is particularly valuable. Healthcare data brokers charge up to $125 per clinical data record, with electronic healthcare databases selling for up to $500,000.[60] In fact, compared to other types of personal data, healthcare data records are by far the most valuable, fetching prices of up to $250 per record on the black market, compared to $5.40 for the next highest value record (a payment card).[61]

102.      Several companies have products through which they pay consumers for a license to track certain information. Indeed, Nielsen, UpVoice, HoneyGain, and SavvyConnect are all companies, in addition to Google, that pay for browsing history information.

---

[59] Geoffrey A. Fowler, *There's no escape from Facebook, even if you don't use it*, THE WASHINGTON POST (Aug. 29, 2021), https://www.washingtonpost.com/technology/2021/08/29/facebook-privacy-monopoly/ (last accessed Mar. 25, 2025).

[60] *The Value of Data*, TRUSTWAVE (2017), *available online at*: https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf.

[61] Todd Zigrang & Jessica Bailey-Wheaton, *Valuing Healthcare Data*, THE VALUE EXAMINER (2023), *available                                     online                                     at*: https://www.healthcapital.com/researchmaterialdocuments/publishedarticles/Valuing%20Healthcare%20Data.pdf

CLASS ACTION COMPLAINT

103.    The unauthorized disclosure of Plaintiff's and Class Members' private and Sensitive Health Information has diminished the value of that information, resulting in harm including Plaintiff and Class Members.

E.    **PLAINTIFF'S AND CLASS MEMBERS' REASONABLE EXPECTATION OF PRIVACY**

104.    At all times when Plaintiff and Class Members provided their Sensitive Health Information to Defendants, they each had a reasonable expectation that the information would remain confidential and that Defendants would not share the Sensitive Health Information with third parties for a commercial purpose, unrelated to providing them with medical care.

105.    Privacy polls and studies show that the overwhelming majority of Americans consider obtaining an individual's affirmative informed consent before a company collects and shares that individual's data to be one of the most important privacy rights.

106.    For example, a recent Consumer Reports study shows that 92-percent of Americans believe that internet companies and websites should be required to obtain consent before selling or sharing consumer data, and the same percentage believe those companies and websites should be required to provide consumers with a complete list of the data that is collected about them.[62]

107.    Moreover, Americans are particularly interested in the safety of their health information. Over 50-percent of Americans believe that "medical-records privacy is not sufficiently protected today by law and organizational practices."[63] And, in a study performed by the National Institutes of Health ("NIH"), nearly 80-percent of respondents reported being "very concerned" or "concerned" about the privacy of medical records.[64]

---

[62] *Consumers Less Confident About Healthcare, Data Privacy, and Car Safety, New Survey Finds*, CONSUMER REPORTS (May 11, 2017), https://www.consumerreports.org/consumer-reports/consumers-less-confident-about-healthcare-data-privacy-and-car-safety-a3980496907 (last accessed Mar. 25, 2025).

[63] *The Value of Data*, TRUSTWAVE (2017), *available online at*: https://www.infopoint-security.de/media/TrustwaveValue_of_Data_Report_Final_PDF.pdf.

[64] Daniel S Gaylin, Adil Moiduddin, Shamis Mohamoud, Katie Lundeen, Jennifer A Kelly, *Public Attitudes about Health Information Technology, and Its Relationship to Health Care Quality, Costs, and Privacy*, HEALTH    SERV.    RES.    (2011),    *available    online    at*: https://pmc.ncbi.nlm.nih.gov/articles/PMC3097409/pdf/hesr0046-0920.pdf.

108.    Personal data privacy and obtaining consent to share Sensitive Health Information are material to Plaintiff and Class Members.

## V.    TOLLING AND ESTOPPEL

109.    Any applicable statutes of limitation have been tolled by Defendants' knowing and active concealment of the incorporation of Google's Tracking Tools onto the Portal.

110.    The Tracking Tools on the Portal were and are invisible to the average website visitor.

111.    Through no fault or lack of diligence, Plaintiff and Class Members were deceived and could not reasonably discover Defendants' deception and unlawful conduct.

112.    Plaintiff was ignorant of the information essential to pursue her claims, without any fault or lack of diligence on their part.

113.    Defendants had exclusive knowledge that the Portal incorporated the Pixels and other Tracking Tools and yet failed to disclose to patients, including Plaintiff and Class Members, that by scheduling appointments through the Portal, Plaintiff's and Class Members' Sensitive Health Information would be disclosed or released to unauthorized third parties, including Google.

114.    Under the circumstances, Defendants were under a duty to disclose the nature, significance, and consequences of its collection and treatment of its patients' Sensitive Health Information. In fact, to the present, Defendants have not conceded, acknowledged, or otherwise indicated to their patients that they have disclosed or released their Sensitive Health Information to unauthorized third parties. Accordingly, Defendants are estopped from relying on any statute of limitations.

115.    Moreover, all applicable statutes of limitation have also been tolled pursuant to the discovery rule.

116.    The earliest that Plaintiff or Class Members, acting with due diligence, could have reasonably discovered Defendants' conduct would have been shortly before the filing of this Complaint.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## VI.    CLASS ALLEGATIONS

117.    This action is brought by the named Plaintiff on her own behalf and on behalf of a proposed Class of all other persons similarly situated under Federal Rules of Civil Procedure 23(b)(2), 23(b)(3), and 23(c)(4).

118.    The Nationwide Class that Plaintiff seeks to represent is defined as follows:

**The Nationwide Class**

All natural persons who used the Portal to schedule or re-schedule an appointment, and whose Sensitive Health Information was disclosed or transmitted to Google or any other unauthorized third party.

119.    In addition to the claims asserted on behalf of the Nationwide Class, Plaintiff asserts claims on behalf of separate Illinois Subclass, which is defined as follows:

**Illinois Subclass**

All natural persons residing in the State of Illinois who used the Portal to schedule or re-schedule an appointment, and whose Sensitive Health Information was disclosed or transmitted to Google, or any other unauthorized third party.

120.    Excluded from the proposed Class are any claims for personal injury, wrongful death, or other property damage sustained by the Class; and any Judge conducting any proceeding in this action and members of their immediate families.

121.    Plaintiff reserves the right to amend the definitions of the Class or add subclasses if further information and discovery indicate that the definitions of the Class should be narrowed, expanded, or otherwise modified.

122.    **Numerosity.** The Class is so numerous that the individual joinder of all members is impracticable. There are at least 10,000 individuals that have been impacted by Defendants' actions. Moreover, the exact number of those impacted is generally ascertainable by appropriate discovery and is in the exclusive control of Defendants.

CLASS ACTION COMPLAINT

123.    **Commonality.** Common questions of law or fact arising from Defendants' conduct exist as to all members of the Class, which predominate over any questions affecting only individual Class Members. These common questions include, but are not limited to, the following:

a)  Whether and to what extent Defendants had a duty to protect the Sensitive Health Information of Plaintiff and Class Members;

b)  Whether Defendants had duties not to disclose the Sensitive Health Information of Plaintiff and Class Members to unauthorized third parties;

c)  Whether Defendants adequately, promptly, and accurately informed Plaintiff and Class Members that their Sensitive Health Information would be disclosed to third parties;

d)  Whether Defendants violated the law by failing to promptly notify Plaintiff and Class Members that their Sensitive Health Information was being disclosed without their consent;

e)  Whether Defendants adequately addressed and fixed the practices which permitted the unauthorized disclosure of patients' Sensitive Health Information;

f)  Whether Defendants engaged in unfair, unlawful, or deceptive practices by failing to keep the Sensitive Health Information belonging to Plaintiff and Class Members free from unauthorized disclosure;

g)  Whether Defendants violated the statutes asserted as claims in this Complaint;

h)  Whether Plaintiff and Class Members are entitled to actual, consequential, and/or nominal damages as a result of Defendants' wrongful conduct;

i)  Whether Defendants knowingly omitted material representations with respect to their data security practices; and

j)  Whether Plaintiff and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Defendants' disclosure of their Sensitive Health Information.

33

124.    **Typicality.** Plaintiff's claims are typical of those of other Class Members because Plaintiff's Sensitive Health Information, like that of every other Class Member, was compromised as a result of Defendants' incorporation and use of the Tracking Tools.

125.    **Adequacy.** Plaintiff will fairly and adequately represent and protect the interests of the members of the Class in that Plaintiff has no disabling conflicts of interest that would be antagonistic to those of the other members of the Class. Plaintiff seeks no relief that is antagonistic or adverse to the members of the Class and the infringement of the rights and the damages Plaintiff has suffered are typical of other Class Members. Plaintiff has also retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously.

126.    **Predominance**. Defendants have engaged in a common course of conduct toward Plaintiff and Class Members in that all the Plaintiff's and Class Members' data was unlawfully stored and disclosed to unauthorized third parties, including Google, in the same way. The common issues arising from Defendants' conduct affecting Class Members set out above predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

127.    **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claim is prohibitively high and would therefore have no effective remedy. The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Defendants. In contrast, the conduct of this action as a class action presents far fewer management difficulties, conserves judicial resources and the parties' resources, and protects the rights of each Class Member.

128.     Defendants acted on grounds that apply generally to the Class as a whole so that class certification, injunctive relief, and corresponding declaratory relief are appropriate on a class-wide basis.

129.     Likewise, particular issues under Fed. R. Civ. P. 23(c)(4) are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

a)    Whether Defendants owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, and safeguarding their Sensitive Health Information and not disclosing it to unauthorized third parties;

b)    Whether Defendants breached a legal duty to Plaintiff and Class Members to exercise due care in collecting, storing, using, and safeguarding their Sensitive Health Information;

c)    Whether Defendants failed to comply with their own policies and applicable laws, regulations, and industry standards relating to data security;

d)    Whether Defendants adequately and accurately informed Plaintiff and Class Members that their Sensitive Health Information would be disclosed to third parties;

e)    Whether Defendants failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information disclosed to third parties; and

f)    Whether Class Members are entitled to actual, consequential, and/or nominal damages and/or injunctive relief as a result of Defendants' wrongful conduct.

130.     Finally, all members of the proposed Class are readily ascertainable. Defendants have access to Class Members' names and addresses affected by the unauthorized disclosures that have taken place.

1

2

**COUNT I**

**COMMON LAW INVASION OF PRIVACY - INTRUSION UPON SECLUSION**
*(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Illinois Subclass)*

3

4

131.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 130 as if fully set forth herein.

5

6

7

8

9

10

132.    Plaintiff and Class Members have an interest in: (1) precluding the dissemination and/or misuse of their highly personal and statutorily protected Sensitive Health Information; and (2) making personal decisions and/or conducting personal activities without observation, intrusion or interference, including, but not limited to, the right to visit and interact with various internet sites without being subjected to the exfiltration and/or unauthorized sharing of their communications without Plaintiff's and Class Members' knowledge or consent.

11

12

13

133.    Plaintiff and Class Members had a reasonable expectation of privacy in their communications with Defendants via the Portal and the communications platforms and services therein.

14

15

16

134.    Plaintiff and Class Members communicated Sensitive Health Information that they intended for only Defendants to receive and that they understood Defendants would keep private and secure.

17

18

19

135.    Defendants' disclosure of the substance and nature of those communications to third parties without the knowledge and informed consent of Plaintiff and Class Members is an intentional intrusion on Plaintiff's and Class Members' solitude or seclusion.

20

21

136.    Plaintiff and Class Members had a reasonable expectation of privacy given Defendants' Privacy Policies and other representations.

22

23

24

137.    Moreover, Plaintiff and Class Members have a general expectation that their communications regarding sensitive, highly personal information would be protected from surreptitious disclosure to third parties.

25

26

27

138.    Defendants' disclosure of Plaintiff's and Class Members' Sensitive Health Information coupled with individually identifying information is highly offensive to the reasonable

28

36

1   person.

2        139.    As a result of Defendants' actions, Plaintiff and Class Members have suffered harm

3   and injury including, but not limited to, an invasion of their privacy rights.

4        140.    Plaintiff and Class Members have been damaged as a direct and proximate result

5   of Defendants' invasion of their privacy and are entitled to compensatory and/or nominal damages.

6        141.    Plaintiff and Class Members seek appropriate relief for that injury including, but

7   not limited to, damages that will reasonably compensate Plaintiff and Class Members for the harm

8   to their privacy interests as a result of the intrusions upon their privacy.

9        142.    Plaintiff and Class Members are also entitled to punitive damages resulting from

10  the malicious, willful and intentional nature of Defendants' actions, directed at injuring Plaintiff

11  and Class Members in conscious disregard of their rights. Such damages are needed to deter

12  Defendants from engaging in such conduct in the future.

13       143.    Plaintiff also seeks such other relief as the Court may deem just and proper.

14

15

16                                        **COUNT II**

17                              **BREACH OF CONFIDENCE**
     *(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Illinois Subclass)*

18       144.    Plaintiff repeats and realleges the allegations contained in paragraphs 131 through

19  143 as if fully set forth herein.

20       145.    Medical providers have a duty to their patients, potential patients, and former

21  patients to keep non-public medical information completely confidential.

22       146.    Plaintiff and Class Members had reasonable expectations of privacy in their

23  communications exchanged with Defendants, including communications exchanged on the Portal.

24       147.    Plaintiff's and Class Members' reasonable expectations of privacy in the

25  communications exchanged with Defendants were further buttressed by Defendants' express

26  promises in their Privacy Policies.

27

28
                                            37

148.    Contrary to their duties as medical providers and their express promises of confidentiality, Defendants deployed the Tracking Tools to disclose and transmit Plaintiff's and Class Members' Sensitive Health Information and the contents of their communications exchanged with Defendants to third parties, including Google.

149.    Defendants' disclosures of Plaintiff's and Class Members' Sensitive Health Information were made without their knowledge, consent or authorization, and were unprivileged.

150.    The harm arising from a breach of provider-patient confidentiality includes erosion of the essential confidential relationship between the healthcare provider and the patient.

151.    As a direct and proximate cause of Defendants' unauthorized disclosures of patient personally identifiable, non-public medical information, and communications, Plaintiff and Class Members were damaged by Defendants' breach in that:

a)    Sensitive and confidential information that Plaintiff and Class Members intended to remain private is no longer private;

b)    Defendants eroded the essential confidential nature of the provider-patient relationship;

c)    Defendants took something of value from Plaintiff and Class Members and derived benefit therefrom without Plaintiff's and Class Members' knowledge or informed consent and without compensating Plaintiff and Class Members for the data;

d)    Plaintiff and Class Members did not get the full value of the medical services for which they paid, which included Defendants' duty to maintain confidentiality;

e)    Defendants' actions diminished the value of Plaintiff's and Class Members' Sensitive Health Information, and

f)    Defendants' actions violated the property rights Plaintiff and Class Members have in their Sensitive Health Information.

152.    Plaintiff and Class Members are therefore entitled to general damages for invasion of their rights in an amount to be determined by a jury and nominal damages for each independent

CLASS ACTION COMPLAINT

violation. Plaintiff is also entitled to punitive damages.

## COUNT III

### BREACH OF FIDUCIARY DUTY
### *(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Illinois Subclass)*

153.    Plaintiff repeats the allegations contained in paragraphs 144 through 152 as if fully set forth herein.

154.    In light of the special relationship between Defendants and Plaintiff and Class Members, whereby Defendants became guardians of Plaintiff's and Class Members' Sensitive Health Information, Defendants became fiduciaries by their undertaking and guardianship of the Sensitive Health Information, to act primarily for Plaintiff and Class Members, (1) for the safeguarding of Plaintiff's and Class Members' Sensitive Health Information; (2) to timely notify Plaintiff and Class Members of an unauthorized disclosure; and (3) to maintain complete and accurate records of what information (and where) Defendants did and do store.

155.    Defendants have a fiduciary duty to act for the benefit of Plaintiff and Class Members upon matters within the scope of Defendants' relationship with their patients and former patients, in particular, to keep secure their Sensitive Health Information private.

156.    Defendants breached their fiduciary duties to Plaintiff and Class Members by disclosing their Sensitive Health Information to unauthorized third parties, and separately, by failing to notify Plaintiff and Class Members of this fact.

157.    As a direct and proximate result of Defendants' breach of their fiduciary duties, Plaintiff and Class Members have suffered and will continue to suffer injury and are entitled to compensatory, nominal, and/or punitive damages, and disgorgement of profits, in an amount to be proven at trial.

## COUNT IV

### NEGLIGENCE
### *(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Illinois Subclass)*

158.    Plaintiff repeats and realleges the allegations contained in in 153 through 157 as if fully set forth herein.

159.    Through their use of the Portal, Plaintiff and Class Members provided Defendants with their Sensitive Health Information, believing such Information would be kept confidential.

160.    By collecting and storing this data, Defendants had a duty of care to use reasonable means to secure and safeguard it from unauthorized disclosure to third parties.

161.    Defendants negligently failed to take reasonable steps to protect Plaintiff's and Class Members' Sensitive Health Information from being disclosed to third parties, without their consent, including to Google.

162.    Defendants further negligently omitted to inform Plaintiff and the Class that they would use their Sensitive Health Information for marketing purposes, and/or that their Sensitive Health Information would be transmitted to third parties.

163.    Defendants knew, or reasonably should have known, that Plaintiff and the Class would not have provided their Sensitive Health Information to Defendants had they known that Defendants intended to use that Information for unlawful purposes.

164.    Defendants' conduct has caused Plaintiff and the Class to suffer damages by having their highly personal, personally identifiable Sensitive Health Information accessed, stored, and disseminated without their knowledge or consent.

165.    Plaintiff and Class Members are entitled to compensatory, nominal, and/or punitive damages.

166.    Defendants' negligent conduct is ongoing, in that it still holds the Sensitive Health Information of Plaintiff and Class Members in an unsafe and unsecure manner. Therefore, Plaintiff and Class Members are also entitled to injunctive relief requiring Defendants to (i) strengthen their data security systems and monitoring procedures; (ii) submit to future annual audits of those systems and monitoring procedures; and (iii) provide adequate credit monitoring to all Class Members.

## COUNT V
## BREACH OF IMPLIED CONTRACT

*(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Illinois Subclass)*

167.    Plaintiff repeats and realleges the allegations contained in paragraphs 158 through 166 as if fully set forth herein.

168.    When Plaintiff and Class Members provided their Sensitive Health Information to Defendants in exchange for medical services, they entered into an implied contract pursuant to which Defendants agreed to safeguard and not disclose the Sensitive Health Information without consent.

169.    Plaintiff and Class Members accepted Defendants' offers and provided their Sensitive Health Information to Defendants.

170.    Plaintiff and Class Members would not have entrusted Defendants with their Sensitive Health Information in the absence of an implied contract between them and Defendants obligating Defendants to not disclose Sensitive Health Information without consent.

171.    Defendants breached these implied contracts by disclosing Plaintiff's and Class Members' Sensitive Health Information to third parties like Google.

172.    As a direct and proximate result of Defendants' breaches of these implied contracts, Plaintiff and Class Members sustained damages as alleged herein.

173.    Plaintiff and Class Members would not have used Defendants' services, or would have paid substantially less for those services, had they known their Sensitive Health Information would be disclosed.

174.    Plaintiff and Class Members are entitled to compensatory, consequential, and/or nominal damages as a result of Defendants' breaches of implied contract.

**COUNT VI**
**UNJUST ENRICHMENT**
*(On Behalf of Plaintiff and the Nationwide Class or, alternatively, the Illinois Subclass)*

175.    Plaintiff repeats and realleges the allegations contained in paragraphs 167 through 174 as if fully set forth herein.

176.    Plaintiff pleads this claim in the alternative to her breach of implied contract claim.

177.    Plaintiff and Class Members conferred a monetary benefit on Defendants in

41

exchange for medical services. Specifically, they provided their Sensitive Health Information to Defendants which Defendants then utilized for marketing and advertising purposes, as described, *supra*.

178.    Defendants knew that Plaintiff and Class Members conferred a benefit upon them, which Defendants accepted. Defendants profited from the Sensitive Health Information of Plaintiff and Class Members by exchanging it for marketing and advertising services.

179.    In particular, Defendants enriched themselves by obtaining the inherent value of Plaintiff's and Class Members' Sensitive Health Information, and by saving the costs it reasonably should have expended on marketing and/or data security measures to secure Plaintiff's and Class Members' Sensitive Health Information.

180.    Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Defendants' decision to prioritize their own profits over the privacy of their patients' Sensitive Health Information.

181.    Under the principles of equity and good conscience, Defendants should not be permitted to retain such benefits obtained by their surreptitious collection and transmission of Plaintiff's and Class Members' Sensitive Health Information.

182.    If Plaintiff and Class Members knew that Defendants had not reasonably secured their Sensitive Health Information, they would not have agreed to provide their Sensitive Health Information to Defendants.

183.    Plaintiff and Class Members have no adequate remedy at law for this count. An unjust enrichment theory provides the equitable disgorgement of profits even where an individual has not suffered a corresponding loss in the form of money damages.

184.    As a direct and proximate result of Defendants' conduct, Plaintiff and Class Members have suffered and will continue to suffer injury.

185.    Defendants should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that they unjustly received from

them, or to refund the amounts that Plaintiff and Class Members overpaid for Defendants' services.

**COUNT VII**

**VIOLATIONS OF THE ELECTRONIC COMMUNICATIONS PRIVACY ACT ("ECPA"), 18 U.S.C. § 2511(1), *et seq.***
**Unauthorized Interception, Use, and Disclosure**
***(On Behalf of Plaintiff and the Nationwide Class)***

186.    Plaintiff repeats and realleges the allegations contained in the paragraphs 175 through 185 as if fully set forth herein.

187.    The ECPA protects both sending and receipt of communications.

188.    18 U.S.C. § 2520(a) provides a private right of action to any person whose wire or electronic communications are intercepted, disclosed, or intentionally used in violation of Chapter 119.

189.    The transmissions of Plaintiff's Sensitive Health Information to the Portal qualify as "communications" under the ECPA's definition of 18 U.S.C. § 2510(12).

190.    <u>Electronic Communications</u>. The transmission of Sensitive Health Information between Plaintiff and Class Members and the Portal with which they chose to exchange communications are "transfer[s] of signs, signals, writing,…data, [and] intelligence of [some] nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic, or photooptical system that affects interstate commerce" and are therefore "electronic communications" within the meaning of 18 U.S.C. § 2510(2).

191.    <u>Content</u>. The ECPA defines content, when used with respect to electronic communications, to "include[] any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(8) (emphasis added).

192.    <u>Interception</u>. The ECPA defines the interception as the "acquisition of the contents of any wire, electronic, or oral communication through the use of any electronic, mechanical, or other device" and "contents … include any information concerning the substance, purport, or meaning of that communication." 18 U.S.C. § 2510(4), (8).

43

193.    <u>Electronical, Mechanical or Other Device</u>. The ECPA defines "electronic, mechanical, or other device" as "any device … which can be used to intercept a[n] … electronic communication[.]" 18 U.S.C. § 2510(5). The following constitute "devices" within the meaning of 18 U.S.C. § 2510(5):

a.    Plaintiff's and Class Members' browsers;

b.    Plaintiff's and Class Members' computing devices;

c.    Defendants' web-servers; and

d.    The Pixel code deployed by Defendants to effectuate the sending and acquisition of patient communications.

194.    By utilizing and embedding the Pixels on the Portal, Defendants intentionally intercepted, endeavored to intercept, and procured another person to intercept, the electronic communications of Plaintiff and Class Members, in violation of 18 U.S.C. § 2511(1)(a).

195.    Specifically, Defendants intercepted Plaintiff's and Class Members' electronic communications via the Pixels, which tracked, stored, and unlawfully disclosed Plaintiff's and Class Members' Private Information to third parties such as Google.

196.    Defendants' intercepted communications include, but are not limited to, communications to/from Plaintiff and Class Members regarding their Sensitive Health Information, including their fact that they made a medical appointment, the name of the clinic with which they scheduled their appointment, the reason for their appointment, and the fact that they had or did not have medical insurance.

197.    By intentionally disclosing or endeavoring to disclose the electronic communications of Plaintiff and Class Members to third parties, while knowing or having reason to know that such information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(c).

198. By intentionally using, or endeavoring to use, the contents of the electronic communications of Plaintiff and Class Members, while knowing or having reason to know that the information was obtained through the interception of an electronic communication in violation of 18 U.S.C. § 2511(1)(a), Defendants violated 18 U.S.C. § 2511(1)(d).

199. <u>Unauthorized Purpose</u>. Defendants intentionally intercepted the contents of Plaintiff's and Class Members' electronic communications for the purpose of committing a tortious act in violation of the Constitution or laws of the United States or of any State—namely, invasion of privacy, among others.

200. The ECPA provides that a "party to the communication" may be liable where a "communication is intercepted for the purpose of committing any criminal or tortious act in violation of the Constitution or laws of the United States or of any State." 18 U.S.C § 2511(2)(d).

201. Defendants are not parties to the communication based on their unauthorized duplication and transmission of communications with Plaintiff and the Class. However, even assuming Defendants are a party, Defendants' simultaneous, unknown duplication, forwarding, and interception of Plaintiff's and Class Members' Sensitive Health Information does not qualify for the party exemption.

202. Defendants' acquisition of sensitive communications that was used and disclosed to Google was done for purposes of committing criminal and tortious acts in violation of the laws of the United States and individual States nationwide as set forth herein, including:

    a. Invasion of privacy;

    b. Breach of confidence;

    c. Breach of fiduciary duty;

    d. Violations of HIPAA, 42 U.S.C. § 1320d-6(a)(3); and

    e. Violations of CIPA, Cal. Pen. Code § 360, *et seq*.

203. Defendants' conduct violated 42 U.S.C. § 1320d-6 in that it used and caused to be used cookie identifiers associated with specific users, including Plaintiff and Class Members,

1  without user authorization; and disclosed individually identifiable Sensitive Health Information to

2  Google without user authorization.

3    204.    Defendants are not exempt from ECPA liability under 18 U.S.C. § 2511(2)(d) on

4  the ground that it was a participant in Plaintiff's and Class Members' communications about their

5  Sensitive Health Information on the Portal, because they used its participation in these

6  communications to improperly share Plaintiff's and Class Members' Private Information with

7  Google and other third-parties that did not participate in these communications, that Plaintiff and

8  Class Members did not know were receiving their Sensitive Health Information, and that Plaintiff

9  and Class Members did not consent to receive their Sensitive Health Information.

10    205.    As such, Defendants cannot viably claim any exception to ECPA liability.

11    206.    Plaintiff and Class Members have suffered damages as a direct and proximate result

12  of Defendants' invasion of privacy in that:

a. Learning that Defendants have intruded upon, intercepted, transmitted, shared, and used their Sensitive Health Information for commercial purposes has caused Plaintiff and Class Members to suffer emotional distress;

b. Defendants received substantial financial benefits from their use of Plaintiff's and Class Members' Sensitive Health Information without providing any value or benefit to Plaintiff or Class Members;

c. Defendants received substantial, quantifiable value from their use of Plaintiff's and Class Members' Sensitive Health Information, such as understanding how people use the Portal and determining what ads people see on the Portal, without providing any value or benefit to Plaintiff or Class Members;

d. Defendants failed to provide Plaintiff and Class Members with the full value of the services for which they paid, which included a duty to maintain the confidentiality of their Sensitive Health Information; and

e. The diminution in value of Plaintiff's and Class Members' Sensitive Health Information and/or the loss of privacy due to Defendants making such Sensitive Health Information, which Plaintiff and Class Members intended to remain private, no longer private.

46

CLASS ACTION COMPLAINT

207.    Defendants intentionally used the wire or electronic communications to increase their profit margins. Defendants specifically used the Tracking Tools to track and utilize Plaintiff's and Class Members' Sensitive Health Information for financial gain.

208.    Defendants were not acting under color of law to intercept Plaintiff's and Class Members' wire or electronic communication.

209.    Plaintiff and Class Members did not authorize Defendants to acquire the content of their communications for purposes of invading their privacy via the Pixels.

210.    Any purported consent that Defendants may claim they received from Plaintiff and Class Members was not valid.

211.    In sending and acquiring the content of Plaintiff's and Class Members' communications relating to their use of the Portal, Defendants' purpose was tortious, criminal, and designed to violate federal and state legal provisions including a knowing intrusion into a private, place, conversation, or matter that would be highly offensive to a reasonable person.

212.    As a result of Defendants' violation of the ECPA, Plaintiff and the Class are entitled to all damages available under 18 U.S.C. § 2520, including statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000, equitable or declaratory relief, compensatory and punitive damages, and attorney's fees and costs.

## COUNT VIII

**VIOLATIONS OF THE CALIFORNIA INVASION OF PRIVACY ACT**
**Cal. Pen. Code § 360,** *et seq.*
*(On Behalf of Plaintiff and the Nationwide Class)*

213.    Plaintiff repeats and realleges the allegations contained in paragraphs 186 through 212 as if fully set forth herein.

214.    The California Legislature enacted CIPA in response to "advances in science and technology" that "have led to the development of new devices and techniques for the purpose of eavesdropping upon private communications[,]" recognizing that "the invasion of privacy resulting from the continual and increasing use of such devices and techniques has created a serious

threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society." Cal. Pen. Code. § 630.

215.    Under CIPA, it is unlawful to:

    i.    "[W]illfully and *without the consent of all parties to the communication*, or in any unauthorized manner, read[], or attempt[] to read, or to learn the contents or meaning of any message, report, or communication while the same is in transit or passing over any wire, line, or cable, or is being sent from, or received at any place within this state;" or

    ii.   "[U]se, or attempt[] to use, in any manner, or for any purpose, or to communicate in any way, any information so obtained[;]" or

    iii.  "[A]id, agree[] with, employ[], or conspire[] with any person or persons to unlawfully do, or permit, or cause to be done any of the acts [prohibited by CIPA.]"

Cal. Penal Code § 631(a) (emphasis added).

216.    At all relevant times, Defendants aided, employed, agreed with, and conspired with Google, and likely other third parties, to track and intercept the Sensitive Health Information communicated by Plaintiff and Class Members while using the Portal, specifically by installing and configuring the Tracking Tools to permit Google to eavesdrop on and intercept in real-time the content of intercept Plaintiff's private communications with Defendants.

217.    The content of those conversations included Sensitive Health Information, including the details of Plaintiff and Class Members' medical appointments with their medical providers. Through Defendants' installation and configuration of the Tracking Tools on the Portal, these communications were intercepted by Google during the communications and without the knowledge, authorization, or consent of Plaintiff and Class Members.

218.    Defendants intentionally inserted an electronic device into the Portal that, without the knowledge and consent of Plaintiff and Class Members, transmitted the substance of their confidential communications with Defendants to third parties.

CLASS ACTION COMPLAINT

219.    Defendants willingly facilitated Google's and likely other third parties' interception and collection of Plaintiff's and Class Members' Sensitive Information by embedding the Tracking Tools on the Portal and into their websites, thereby assisting Google's eavesdropping.

220.    The following items constitute "machine[s], instrument[s], or contrivance[s]" under the CIPA, and even if they do not, the Tracking Tools fall under the broad catch-all category of "any other manner":

    i.    The computer codes and programs Google, Facebook and other third parties used to track intercept Plaintiff's and Class Members' communications while they were navigating the Portal;

    ii.    Plaintiff's and Class Members' internet browsers;

    iii.    Plaintiff's and Class Members' computing and mobile devices;

    iv.    Google's web and ad servers;

    v.    The web and ad servers from which Google and other third parties tracked and intercepted Plaintiff's and Class Members' communications while they were using a web browser to access or navigate the Portal; and

    vi.    The computer codes and programs used by Google and other third parties to effectuate their tracking and interception of Plaintiff's and Class Members' communications while they were using a browser to visit the Portal.

221.    As demonstrated above, Defendants violated CIPA by aiding and permitting third parties, including Google, and its agents, clients, employees, and contractors, to receive Plaintiff's and Class Members' Members' Sensitive Health Information in real time, through the Portal, without their consent

222.    By disclosing Plaintiff's and Class Members' Sensitive Health Information, Defendants violated Plaintiff's and Class Members' statutorily protected right to privacy.

223.    As a result of Defendants' violation of the CIPA, Plaintiff and Class Members are entitled to treble actual damages related to their loss of privacy in an amount to be determined at

trial, statutory damages, attorney's fees, litigation costs, injunctive and declaratory relief, and punitive damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, on behalf of herself and other Class Members, prays for judgment against Defendants as follows:

A.    an Order certifying the Nationwide Class and Illinois Subclass, and appointing the Plaintiff and their Counsel to represent the Classes;

B.    equitable relief enjoining Defendants from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of the Sensitive Health Information of Plaintiff and Class Members;

C.    injunctive relief requested by Plaintiff, including, but not limited to, injunctive and other equitable relief as is necessary to protect the interests of Plaintiff and Class Members;

D.    an award of all damages available at equity or law, including, but not limited to, actual, consequential, punitive, statutory and nominal damages, as allowed by law in an amount to be determined;

E.    an award of attorney fees, costs, and litigation expenses, as allowed by law;

F.    prejudgment interest on all amounts awarded and

G.    all such other and further relief as this Court may deem just and proper.

Dated: April 3, 2025                        Respectfully submitted,

                                            */s/ Catherine E. Ybarra*
                                            Catherine E. Ybarra (SBN # 283360)
                                            cybarra@sirillp.com
                                            **SIRI & GLIMSTAD LLP**
                                            700 S. Flower Street, Ste. 1000
                                            Los Angeles, CA 90017
                                            Telephone: (213) 376-3739

                                            Tyler J. Bean*
                                            tbean@sirillp.com
                                            Sonjay C. Singh*
                                            ssingh@sirillp.com
                                            **SIRI & GLIMSTAD LLP**
                                            745 Fifth Avenue, Suite 500

New York, New York 10151
Tel: (212) 532-1091

*pro hac vice admission anticipated*

CLASS ACTION COMPLAINT

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff, on behalf of herself and other members of the proposed Classes, hereby demands a jury trial on all issues so triable.

Dated: April 3, 2025                                  Respectfully submitted,

                                                     _/s/ Catherine E. Ybarra_
                                                     Catherine E. Ybarra (SBN # 283360)

CLASS ACTION COMPLAINT